# EXHIBIT A

## ☐ ORIGINAL

## ☐ ORIGINAL

S͘

DISTRICT OF COLUMBIA
/ISION

**FILED**
CIVIL ACTIONS BRANCH

Case No. 0001108-09 FEB 2 3 2009
SUPERIOR COURT
OF THE DISTRICT OF COLUMBIA
WASHINGTON, DC

CLASS ACTION

DEMAND FOR TRIAL BY JURY

| | |
|---|---|
| JAMMIE McKAY, 1400 Jackson Street, NE Washington, DC  20017   and | ) ) ) |
| CLAIRE TEASLEY, 2117 "L" Street, NW Suite 273 – Washington, DC  20037, On Behalf of Themselves and All Others Similarly Situated in the District of Columbia, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) |
| VERTRUE INCORPORATED, previously known as MEMBERWORKS, INCORPORATED 20 Glover Avenue Norwalk, CT 06850 | )) ) ) ) |
| ADAPTIVE MARKETING LLC 20 Glover Avenue Norwalk, CT 06850, and | ) ) ) ) |
| DOES 1 through 50, | ) |

(1) VIOLATION OF THE DISTRICT OF COLUMBIA CONSUMER PROTECTION PROCEDURES ACT;

(2) CONVERSION;

(3) UNJUST ENRICHMENT;

(4) FRAUD AND DECEIT; AND

(5) NEGLIGENT MISREPRESENTATION

Defendants.

---

## ORIGINAL COMPLAINT

NOW COMES, Jammie McKay and Clarie Teasley, on behalf of themselves and all others

similarly situated in the District of Columbia (collectively, "Plaintiffs"), by and through counsel, and

for their complaint state the following:



- 1 -

### SUMMARY OF COMPLAINT

1.      Defendants MemberWorks, Inc.,[1] also known as MWI Essentials, MWI Leisure

Advantage, MWI Home & Garden, MWI Connections, MWI Value Max and other MWI entities,

which subsequently changed its name to Vertrue Incorporated (collectively, "MWI"),[2] in conjunction

with its co-conspirators, the telemarketing entities (collectively, the "Telemarketers" or

"Telemarketing Entities")[3] and the bait product suppliers (the "Bait Product Suppliers") have been

engaged in the practice of making unlawful charges to consumers' credit and/or debit cards through

a scheme involving the mailing of an unordered membership program marketed through the use of a

[1]      MemberWorks, Inc., with Adaptive Marketing LLC and Doe defendants 1 through 50 are
referred to herein as "Defendants."

[2]      As used in this Complaint, the term "Defendants" does not refer to West Corporation, and/or
West Telemarketing Corporation, and/or West Telemarketing, L.P. and their predecessors,
successors, present and former owners, subsidiaries, affiliates, employees, officers, directors, agents,
attorneys and assigns, including West Direct, Inc. and West TeleServices Corporation (collectively,
"West"). Therefore, any reference to acts or omissions by "Defendants" does not include or refer to
the West entities. Further, the claims for relief in this Complaint do not arise from actions or
omissions under the following agreements: the March 16, 1998 "Joint Marketing Agreement
between West Telemarketing Corporation and MemberWorks Incorporated," and/or the January 1,
1999 "Agreement" between West Telemarketing Corporation and MemberWorks Incorporated,
and/or the July 1, 1999 "Joint and Wholesale Marketing Agreement" between West Telemarketing
Corporation, West Teleservices Corporation and MemberWorks Incorporated and/or the
December 1, 2001 "Wholesale and Retail Marketing Agreement" between MemberWorks
Incorporated and West Direct, Inc., and any amendments or addendums to these agreements. Thus,
by way of example (but without limitation), any acts or omissions that include, relate to or were part
of an upsell to a Tae-Bo product that occurred under or as part of one of the agreements listed in this
footnote 1, are not included in the claims and allegations of this Complaint.

[3]      As used in this Complaint, the terms "Telemarketers" and "Telemarketing Entities" and the
allegations of this Complaint referring to acts or omissions of "Telemarketing Entities" and
"Telemarketers" do not include or refer to the actions or omissions of West Corporation and/or West
Telemarketing Corporation under the March 16, 1998 "Joint Marketing Agreement between West
Telemarketing Corporation and MemberWorks Incorporated," and/or the January 1, 1999
"Agreement" between West Telemarketing Corporation and MemberWorks Incorporated, and/or the
July 1, 1999 "Joint and Wholesale Marketing Agreement" between West Telemarketing
Corporation, West Teleservices Corporation and MemberWorks Incorporated and/or the
December 1, 2001 Wholesale and Retail Marketing Agreement between MemberWorks Incorporated
and West Direct, Inc., and any amendments or addendums to these agreements.

deceptive script. Defendants obtain the necessary information to mail their unwanted membership (and charge for it) through the use of a telemarketing scam. By this method, Defendants are able to accomplish the old and pernicious practice of mailing unsolicited merchandise and then tricking consumers into paying for it.

2.     MWI, in concert with the Telemarketers and the Bait Product Suppliers, through agreements with MWI, capture consumers' credit and/or debit card information when those consumers call to order products – products which are *not* marketed or produced by MWI. This is referred to as an "inbound" telemarketing call, as the consumer initiates the call. The consumer has initiated the call to inquire about or purchase a product usually advertised with a 1-800 number. The consumer *does not call* to order an MWI product. In fact, the consumer has most likely never heard of MWI and has no expectation of receiving an MWI membership program when the call is made by the consumer. Moreover, the consumer gives his/her credit card or debit card information, which Defendants capture long before the consumer ever hears of any MWI product. This private financial information is then used by Defendants to charge the consumer for a membership the consumer never wanted or agreed to purchase.

3.     MWI has reached agreements with a number of Telemarketing Entities, whereby the consumer is subjected to a deceptive sales pitch to purchase an MWI membership program before the call made by the consumer to purchase an unrelated product is completed. This is referred to as an "unrelated upsell." MWI's products are not related to the product sought by the consumer and the consumer has no idea that an MWI product will be made a part of the call – or even what an MWI product is.

4.     MWI prepares a script for the Telemarketers to use for the unrelated upsell. As more specifically alleged below, MWI pays the Telemarketers and the Bait Product Suppliers a fee for each consumer who they enroll in MWI's membership programs. Some number of MWI

- 3 -

membership programs are sold through a joint venture and wholesale arrangement between MWI and the Telemarketers, where MWI and the Telemarketers jointly pay a separate fee to the Bait Product Suppliers for each of their customers enrolled in an MWI program. The Telemarketers, who handle the inbound calls, approve the scripts, read the scripts to the consumers, capture the consumers' credit and/or debit card information and transmit that information to MWI to mail the "kits" and bill the consumers' cards.

5.     After the consumers have given the information necessary to purchase the product the consumers called to buy, a deceptive script is read to the consumers informing them that they will be sent *free* materials in the mail. Consent to receive the materials in the mail is not requested. Consent to bill the credit and debit cards is not requested. In actuality, Defendants enroll consumers in a membership and mail them a membership "kit." Consumers are deceived and do not know that they have been enrolled in a "membership" and will be charged $60-$150 annually unless they call MWI to inform them that they want to cancel the FREE 30-day trial membership. MWI mails a packet with a membership card to the consumers which allows the consumers to access the so-called benefits of an MWI membership. By enrolling consumers who called to order an unrelated product and mailing those consumers a membership kit without the prior express consent of the consumers, consumers are unwittingly charged by Defendants for a membership they neither requested nor intended to purchase.

6.     Consumers are never asked their permission for the Telemarketers to provide their credit and/or debit card information to MWI. MWI has the Telemarketing Entities transfer the class members' confidential credit and/or debit card information to MWI, who uses the information to charge consumers membership fees and membership renewal fees which range from $60-$150 annually. Although MWI processes the charges, neither it nor the Telemarketing Entities send the

- 4 -

consumers any bill or invoice notifying them that their credit and/or debit cards have been assessed such a charge.

7. In order to conceal their scheme, MWI will reverse the charges for those consumers who notice that they have been assessed a charge on their credit and/or debit card statements who call to question the charge and get through Defendants' multifarious system of avoiding cancellations. However, as Defendants know, a significant percentage of the population does not closely review their credit and/or debit card statements, and will not notice the offending charge (as was the case with plaintiff Patricia Sanford in the federal action, *Sanford, et al. v. MemberWorks, Inc., et al.*, No. 02-CV-0601 (S.D. Cal.) ("*Sanford* Federal Class Action"),[4] who did not realize she had been assessed such a charge until the *second* time it appeared on her credit card statement). These individuals are charged between $60-$150, each year, until they notice the charge and complain. *Defendants never send any bill or invoice to the class members notifying them that they have been, or will be, charged.* The named Plaintiffs and the class members in this action were all victimized by Defendants by this same exact method.

8. Defendants share in the revenues and profits generated from their deceptive scheme of mailing unordered merchandise and then charging consumers for it.

---

[4]     The *Sanford* Federal Class Action was filed in 2002, as a class action against West and MWI in the United States District Court for the Southern District of California. The claims against MWI were asserted on behalf of all consumers in the United States enrolled in an MWI membership in connection with their purchase of an unrelated bait product. The claims against West were asserted on behalf of all consumers in the United States enrolled in an MWI membership program who were customers of a joint venture between MWI and West or were wholesale customers of West. The district court dismissed the federal count against West and declined to exercise supplemental jurisdiction over the state law claims. Plaintiffs re-filed the state law claims against West (*Sanford v. West Corporation and West Telemarketing Corporation, et al.*, Case No. GIC 805541 (the "*West* Action")) and was ultimately assigned to the Honorable Ronald L. Styn. The *West* Action included the same or similar claims, based on the same factual allegations asserted in this action. The *West* court certified a class (February 16, 2007 Order Granting Plaintiffs' Motion for Class Certification), the case settled and Final Approval of the settlement was entered on December 24, 2008.

9. Defendants' conduct violates the District of Columbia Consumer Protection Procedures Act ("CPPA"), and also constitutes fraud and deceit, conversion, unjust enrichment and negligent misrepresentation. Plaintiffs, therefore, seek on behalf of themselves and all others similarly situated in the District of Columbia compensatory and punitive damages, costs, attorneys' fees and injunctive relief against Defendants barring them continuing deceptive and false business and trade practices in connection with their advertising and enrollment in Defendants' membership programs.

## JURISDICTION AND VENUE

10. This is an action for damages, injunctive relief and other statutory relief pursuant to the CPPA, D.C. Code §§28-3901-28-3911, and the common law to obtain injunctive relief to prevent the unlawful acts and practices alleged in this Complaint and other relief, including restitution, civil penalties, costs of investigation and attorneys' fees.

11. This Court has jurisdiction over Defendants pursuant to D.C. Code §11-921 because each defendant is either a corporation or association organized under the laws of the District of Columbia, a foreign corporation or association authorized to do business in the District of Columbia, or does sufficient business, has sufficient minimum contacts with District of Columbia or otherwise intentionally avails itself of the District of Columbia market, through the manufacturing, production, promotion, sale, marketing and distribution of its products in the District of Columbia, and committing a tortuous act within the District of Columbia to render the exercise of jurisdiction by the District of Columbia courts permissible under traditional notions of fair play and substantial justice.

12. Venue is proper in this Court since Plaintiffs, as well as numerous class members reside in and throughout the District of Columbia and Defendants either maintain offices in the District of Columbia, a substantial portion of the practices complained of herein occurred in the

- 6 -

District of Columbia or because Defendants have received substantial compensation as a result thereof in the District of Columbia.

13.     Venue is also proper in this Court in that the state law claims alleged herein were severed from the *Sanford* Federal Class Action, and the federal court directed that the state law claims be filed in state court.

## PARTIES

14.     Plaintiff Jammie McKay ("McKay") has been, at all times relevant to the action, a resident of the District of Columbia. Plaintiff McKay purchased Tae-Bo fitness videotapes after viewing the television advertising campaign for the product. In connection with this purchase, MWI charged plaintiff McKay unsolicited, unauthorized and unexpected charges for several of MWI's membership programs. Plaintiff McKay was never asked for his consent to be charged for any of these MWI membership programs. Moreover, plaintiff McKay never utilized or received any benefit from any of the MWI membership programs. Plaintiff McKay's credit card was assessed unsolicited and unexpected charges totaling approximately $180.00 for one or more MWI membership programs.

(a)     On or about February 14, 2000, at the end of the call to purchase the bait product, Tae-Bo fitness exercise videotapes, the telemarketer who answered the call read MWI's deceptive telemarketing pitch to plaintiff McKay informing him he would be receiving a risk-free 30-day trial membership, emphasizing the thank you gift was FREE and that plaintiff McKay, "WON'T BE BILLED." The language of the deceptive telemarketing pitch is quoted in full in ¶27 below.     The telemarketer thereafter transferred plaintiff McKay's confidential credit card information to MWI using the wires. Thereafter, on March 14, 2000, in connection with the Tae-Bo product, plaintiff McKay's credit card was assessed an unsolicited and unexpected $84.00 charge by Defendants for a Travel Arrangement's membership.

- 7 -

(b) On January 15, 2001, MWI charged plaintiff McKay's credit card an unsolicited and unexpected renewal fee of $99.95 (charged as "MWI Travel").

15. Until recently, plaintiff McKay was completely unaware of the charges or that he had been enrolled in any MWI membership and/or that his credit card had been billed.

16. Plaintiff Claire Teasley ("Teasley") has been, at all times relevant to the action, a resident of the District of Columbia. Plaintiff Teasley purchased Tae-Bo fitness videotapes after viewing the television advertising campaign for the product. In connection with this purchase, MWI charged plaintiff Teasley unsolicited, unauthorized and unexpected charges for a MWI membership program. Plaintiff Teasley was never asked for her consent to be charged for the MWI membership program. Moreover, plaintiff Teasley never utilized or received any benefit from any of the MWI membership programs. Plaintiff Teasley's credit card was assessed unsolicited and unexpected charges for one or more MWI membership programs.

(a) On or about April 9, 2000, at the end of the call to purchase the bait product, Tae-Bo fitness exercise videotapes, the telemarketer who answered the call read MWI's deceptive telemarketing pitch to plaintiff Teasley informing her she was receiving a risk-free 30-day trial membership in Travel, emphasizing the thank you gift was FREE and that plaintiff Teasley, "WON'T BE BILLED." The language of the deceptive telemarketing pitch is quoted in full in ¶27 below. The telemarketer thereafter transferred plaintiff Teasley's confidential credit card information to MWI using the wires. Thereafter, on May 9, 2000, in connection with the Tae-Bo product, plaintiff Teasley's credit card was assessed an unsolicited and unexpected $84.00 charge by Defendants for a Travel Arrangement's membership.

(b) On March 12, 2001, MWI charged plaintiff Teasley's credit card an unsolicited and unexpected renewal fee of $99.95 (charged as "MWI Travel").

- 8 -

17.    Until recently, plaintiff Teasley was completely unaware of the renewal charge or that she had been enrolled in any MWI membership and/or that her credit card had been billed.

18.    In addition, Plaintiffs include in their allegations the names, the dates of the fraudulent charges and the bogus membership enrollments of unnamed District of Columbia class members.[5] The names of the unnamed class members represent only a fraction of the unnamed class members included in the proposed class. The identity of the remainder of the unnamed class members are contained within MWI's electronic database(s), and will be revealed through discovery. Each of these unnamed class members, as well as each of the unnamed class members who have yet to be identified through discovery, received the deceptive telemarketing pitch at the end of their calls, the language of which is quoted at ¶27 below.

19.    At this time, without the benefit of discovery from Defendants, Plaintiffs are aware that the most recent telemarketing pitch was made on or about September 10, 2002, and that the most recent fraudulent charge occurred on October 15, 2002. Based upon a database MWI produced in the related California state court action, Plaintiffs are aware that the most recent fraudulent charge to a *West* subclass member was levied on March 9, 2007 – the month that the database was produced. Accordingly, based upon this information Plaintiffs believe that discovery will reveal a continuation of the pattern and practice of fraudulently charging the credit and debit cards of the class members in this action, through at least March 2007, through the present, and for the foreseeable future.

20.    Defendant Vertrue Incorporated, previously known as MWI, has been, at all times relevant to the action, a Delaware corporation whose primary place of business is 20 Glover Avenue, Norwalk, Connecticut. Defendant MWI does business in the District of Columbia, and throughout

---

[5]    The information regarding these unnamed class members was obtained pursuant to a protective order and is required to filed under seal. If the Court desires, Plaintiffs will amend this complaint to add these additional unnamed class members.

- 9 -

the nation, as MWI Essentials, MWI Leisure Advantage, MWI Home & Garden, MWI Connections, Health Trends, Travel Arrangements, Transmedia, Cardmember Protection Service, Countrywide Dental, 24 Protect, Smartsource, Value Max Shopping Service, Money Master Tai Value Max, Tai Vital Basics and various other names under which it markets and charges consumers, by and through nationwide telemarketing campaigns, as well as by and through the interstate instrumentality of mailings throughout the District of Columbia and the nation. Defendant MWI entered into express and tacit agreements with the Telemarketers. Defendant MWI drafted the deceptive script used and sought comments from and approval by the Telemarketers. Defendant MWI operates and is involved in the unlawful scheme of charging the credit card and/or debit card accounts of consumers for unordered merchandise.

21.     Defendant Adaptive Marketing LLC is a Delaware limited liability company with its principal place of business in Norwalk, Connecticut (collectively with Vertrue Incorporated). Adaptive Marketing LLC is a wholly-owned subsidiary and "operating company" of Vertrue Incorporated. Adaptive Marketing LLC shares personnel with Vertrue Incorporated and markets Vertrue Incorporated's membership programs. There exists, and at all relevant times, a unity of interest and ownership between MWI and Adaptive Marketing LLC, such that any individuality and separateness between each of them ceased and each is the alter ego of the other in that each entity is completely controlled, dominated, managed and operated without regard for corporate individuality.

22.     The true names and capacities of defendants sued herein as Does 1 through 50, inclusive, are presently unknown to Plaintiffs, who therefore sues the Doe defendants by such fictitious names. Plaintiffs will seek to amend this Complaint and include the Doe defendants' true names and capacities when they are ascertained. Each of the fictitiously named defendants are responsible in some manner for the conduct alleged herein and are therefore responsible for the damages suffered by Plaintiffs and class members.

- 10 -

23. In committing the wrongful acts alleged herein, Defendants have pursued a common course of conduct, acted in concert with, aided and abetted and conspired, in furtherance of their common plan, scheme or design to make unauthorized charges to customers' credit cards and/or debit cards for an unsolicited, unwanted and unordered membership and thereafter to conceal and cover up their wrongdoing – all for their own personal profit. Defendants actually knew, or should have known, of the fraudulent conduct being committed and actively participated in covering up its true nature. Thus, in addition to the wrongful conduct herein alleged as giving rise to primary liability, Defendants further aided and abetted and knowingly assisted each other in the breach of their respective duties, contracts and obligations as herein alleged, and acted as the agent of each other in participating in this wrongdoing.

24. At all times herein mentioned in the claims for relief alleged herein, each and every defendant was an agent and/or employee of each and every other defendant. In doing the acts alleged in the claims for relief alleged herein, each and every defendant was acting within the course and scope of this agency or employment, and were acting with the consent, permission and authorization of each of the remaining Defendants. All of the actions of each defendant as alleged in the claims for relief stated herein were ratified and approved by every other defendant or their officers or managing agents.

## DEFENDANTS' WRONGFUL CONDUCT

### The Upsell

25. Defendants obtain the necessary information to bill consumers for MWI memberships by piggybacking onto popular consumer products. MWI looks for products advertised heavily on television or in print which ask consumers to call a 1-800 number to order that product. Some examples of the products which MWI uses to upsell its programs are: Nad's, Tae-Bo, vitamins, knives, Q-Ray bracelets, Edgemaster paint roller, Simoniz car washer, flowers, dance videos, AB Slider, ultrasonic toothbrushes and OxiClean.

- 11 -

26. The consumers see the advertising for the product (such as a Tae-Bo, a Nad's, a Simoniz car washer or an OxiClean infomercial) and call the 1-800 number. The consumer has not seen or heard anything about any MWI product and has no desire or intent to purchase an MWI product. The consumer is most likely to wind up speaking with an employee of the Telemarketers. The consumers go through the process of ordering the product they wanted and the Telemarketing Entities who handle the incoming calls "capture" the consumers' credit or debit card information. This portion of the call may take anywhere from 5-15 minutes or so.

27. Before the Telemarketers let the consumers off the line, MWI has the Telemarketing Entities read the following deceptive script to the consumers:

> Mr(s) _____, for purchasing [NAME OF BAIT PRODUCT] today, we're sending you a risk-FREE 30-day membership to [MWI PROGRAM], a service designed to SAVE YOU 20% from leading stores such as [STORES], PLUS additional savings on eyewear, beauty products, haircuts and more! After 30 days, the service is extended to a full year for just $6 a month, billed annually in advance to the credit card you're using today. If you want to cancel, just call the toll-free number that appears in your kit in the first 30 days and YOU WON'T BE BILLED. So look for that kit in the mail, OKAY?[6]

28. The words in ALL CAPITAL LETTERS are the words the telemarketer emphasizes when reading the script. In other words, MWI emphasizes that the trial membership is "FREE," and that class members "WON'T BE BILLED." At the end of the call, MWI merely tells class members: "So look for that kit in the mail, OKAY?" MWI does not ask the consumers if they want to receive the purported trial membership, let alone any agreement to be enrolled in the membership. And, MWI does not ask the consumers for permission or consent to charge their credit and/or debit cards.

---

[6] While there can be minor variations to the script – *e.g.*, the list of stores can change, the MWI program can change, the script may say "to thank you for your purchase," or as a "special thanks," and such – the substance of the telemarketing pitch is identical across all scripts.

29.     At most, the consumer is led to believe that a free trial membership will be mailed to the consumer to evaluate, and if the consumer likes the product he or she can call to purchase a membership. *No express consent to mail the membership is obtained from the consumer, let alone any agreement to be enrolled in the membership. Nor is any express consent requested to bill the consumers' credit or debit cards*. This is Defendants' "upsell" and Defendants' excuse for charging consumers for a membership program they neither wanted nor ordered.

30.     Notwithstanding the failure to obtain consent to enroll consumers in MWI's membership programs and charge their cards, the Telemarketing Entities transfer the class members' confidential credit and/or debit card information, which they obtained when the consumers called to purchase the unrelated bait products, to MWI. MWI then mails a membership kit and charges the consumers' credit and/or debit cards. Neither Defendants, nor the Telemarketing Entities, nor the Bait Product Suppliers seek or obtain the consumers' express consent to charge the MWI membership to the consumers' credit and/or debit card accounts.

31.     The fraud at issue is the assessment of an unsolicited and unlawful fee charged to consumers which the consumers did not seek out and did not want. The consumers are deceived by Defendants' purposely misleading script, then mailed a membership kit and enrolled and charged for a membership they did not want or order. Defendants' automatic self-renewing membership is an outright theft of money under the guise of a membership.

**The Mechanics of the Scheme**

32.     To generate calls, Defendants rely on the popularity of the non-MWI products offered by the bait entities.

33.     After a consumer has viewed an infomercial or read an advertisement for a bait product they want to purchase, the class members call a "1-800" telephone number to order the product. The purchasers of these products are given the option of purchasing by credit card or debit

- 13 -

card. To complete the purchase, the class members are required to provide their names, credit or debit card numbers and the expiration date to the Telemarketers who answer the calls and process the sales. Thus, at the end of the purchase transactions, the Telemarketing Entities possess all of the information necessary for MWI to assess the unsolicited membership fees against unsuspecting consumers.

34. After the financial information for the sale of the advertised bait product is obtained by the Telemarketers, MWI has them read the "upsell" script. The message of the upsell script is that the consumer will be mailed a 30-day, risk-free trial membership. The class members are not asked whether they want to enroll, they are not billed or invoiced and they are not asked to give or to confirm their credit or debit card information to pay for the membership. Instead, Defendants wait approximately 30 days and then charge the class members' credit and/or debit cards using the information Defendants received from consumers when they purchased the product they actually wanted.

35. The class members are never asked to provide their confidential credit or debit card information in connection with the unrelated MWI upsell. Class members are never asked to give permission to permit their confidential financial information to be transferred to defendant MWI. The class members are never even asked if they want to receive the purported membership materials – rather they are simply informed that for purchasing the advertised product risk-free they are being sent a 30-day trial membership. The purported membership kit which allows the consumer to access the so-called benefits of the program are mailed shortly after the call.

36. Approximately one month after the call, defendant MWI uses the confidential financial information it received from the consumers' purchases of the unrelated product to charge the class members' credit and/or debit cards. On information and belief, some consumers are "enrolled" more than once. This situation would only arise if the consumer did not know they had

- 14 -

already been enrolled, or were going to be enrolled, in the purported membership as no one would twice pay $60-$150 to MWI to join the same membership. It, of course, makes no difference to MWI how many times a consumer is enrolled, as each "enrollment" is simply another $60-$150 a year for MWI, other than if a member is "enrolled" multiple times, they are more likely to notice the offending charge.

37.     The class members do not know they have been enrolled in MWI's membership programs and therefore never use any of the programs' so-called benefits (*see* ¶¶54-61 below). Defendants count on this deception and subsequent non-use of the benefits to hold the costs of the programs to a nominal amount thus making the annual fees pure profit for Defendants.

38.     Unless the class member notices the charge to their debit and/or credit card and call to complain, the class member will continue to be charged $60-$150 each and every year. As with the initial charges to the class members' credit and/or debit cards, no invoice or bill is ever sent to the class members to inform them that their credit and/or debit cards have been, or will be, charged by defendant MWI. What is even more insidious is that the purported "annual" membership is charged every 11 months and, similarly, no invoice or bill is ever sent to the class members for renewal charges.

39.     The fraud is perpetuated because the customers' prior expressed acceptance or consent to enroll in the membership is not obtained. Defendants do not clearly and unambiguously communicate the terms of the purported membership programs. The membership that is mailed is neither risk-free, nor a free 30-day trial as was represented by Defendants. Defendants charge the class members for a membership they did not order. The consumers charged for the membership who never use the so-called benefits are paying $60-$150 per year for nothing.

40.     Defendants know that consumers do not understand that they will be charged a membership fee unless they call to cancel. Defendants mail the membership kit fully understanding

- 15 -

that the consumers will not understand they are being charged for the materials. Further, Defendants have designed the generic membership materials so as to appear to be "junk mail" so the materials will be discarded and thus never read. Defendants purposely design their scripts to maximize consumer confusion and allow Defendants to "enroll" the maximum number of unsuspecting persons. Defendants then mail the membership kit to the deceived and/or confused consumers who Defendants "enroll" in the MWI memberships. Defendants are able to maximize their profits at the expense of the consumers deceived by Defendants' scheme.

41.    The *only* notice that a class member receives that he or she has been charged for a membership is his or her credit or debit card statement reflecting a charge – which may or may not identify MWI as the entity who levied the charge – which the class member may not notice depending on how closely the class member reads his or her credit and/or debit card statement. If the class member notices and challenges the charge, the charge may be reversed or a pro rata refund may be sent. In this way, Defendants conceal their deception from the other class members and from the public. Those class members who do not notice the charge are billed every 11 months until they notice that they have been charged and complain.

42.    These acts take place as a result of the concerted action, agreement and direction by Defendants.

## The Lack of Audiotaped Confirmations

43.    Until required as part of the Nebraska Attorney General "Better Practices" requirements, Defendants failed to confirm consumers' acceptance of the upsell offer by MWI for many, if not most, of the "enrolled" consumers.

44.    Accordingly, no audiotaping of the upsells occurred for most of the class members deceived by Defendants.

- 16 -

**The Deceptive "Upsell" Script**

45.    Defendants worked together to produce a script to be read to each consumer. MWI creates the deceptive scripts to be read when marketing the MWI programs and the Telemarketing Entities comment on and approve the deceptive scripts.

46.    Defendants purposely avoid clearly and unambiguously notifying consumers that their credit and/or debit cards will be charged between $60-$150 for the "membership" mailed to them. No focus groups or other consumer research is undertaken by Defendants. Even after Defendants received numerous consumer complaints, ranging from a lack of any recollection of ever even hearing of MWI or any of its purported memberships to accusations of fraud and theft, Defendants avoided ascertaining whether their scripts clearly and unambiguously (i) requested consent from the consumer to charge for the membership, (ii) notified the consumers of the terms of the purported membership or (iii) informed the consumers that their credit and/or debit cards would be charged.

47.    Defendants are well aware of the fact that consumers are deceived by their scripts as seven state attorneys general alleged that MWI was deceiving consumers. MWI settled the matters with five of the attorneys general, and agreed to pay civil penalties in excess of $2 million to one of those attorneys general. Defendants know that consumers are misled into believing that they are not making a purchase decision regarding the MWI memberships. Defendants' script is intended to, and does, convey to consumers that the membership mailed to them is a free trial membership, which if they like the membership they can call to order.

48.    The scripts are written and designed to be read in a manner intended to confuse, mislead and deceive consumers.

49.    Defendants' conduct is deceptive, unlawful and fraudulent and it cannot be justified in any manner. Indeed, seven different attorneys general have determined that the MWI scripts are

- 17 -

deceptive and do not clearly and unambiguously communicate to consumers that they will be charged for an annual self-renewing membership unless they affirmatively act to cancel the membership. Nor do the scripts inform the class members that they will be required to return the purported membership card should they desire to cancel.

## The Membership

50.    After receiving the class members' confidential financial information by piggybacking onto the advertised product, defendant MWI mails out membership materials and customer service information to the persons enrolled. Then, MWI simply bills the consumers $60-$150 each year on the consumer's credit or debit card.

51.    Defendants have designed the generic purported membership materials so as to appear to be "junk mail" in the hopes that the materials will be discarded and thus never read. If the packet mailed by MWI for the risk-free trial membership is thrown out by the recipient, then the consumer will not have the number to access the so-called benefits. The kits are mailed out bulk rate indicating the lack of value of the material. The kits contain a cheap paper membership card typical of cards received in mail solicitations. This card is, however, the actual membership card for the enrolled member. By making the kit typical junk mail, Defendants further conceal the fact that the class members have been charged an annual, self-renewing membership fee.

52.    Other than the one line on their credit and/or debit card statements, the class members are not notified that they have been "enrolled" in an MWI membership program or that their credit and/or debit cards have been charged. Defendants do not send new "members" any invoice or record of the charge. Moreover, after the membership kits are mailed and consumers are charged and throughout the duration of the "membership," class members never hear from any of the Defendants about any membership benefits. After the initial mailing of the membership kit, consumers do not

- 18 -

receive any newsletters, coupons, surveys or any other notifications. The only thing they receive is a charge of $60-$150 on their credit and/or debit cards.

53. The term "membership" used by Defendants is merely an excuse to take money from consumers who submit their credit and/or debit card information for their purchase of other products. Defendants take consumers' money by mailing them an unordered membership and then charging them for it.

## Lack of Usage of the Membership Benefits

54. The manner in which a consumer can access the purported membership is further evidence of Defendants' scheme to defraud. Other than the purported membership kit, Defendants do not send "members" anything. No newsletter or other correspondence is sent to the class members. No confirmation letters or satisfaction surveys are sent. The class members receive nothing after they are charged, or before the next time they are "renewed."

55. For consumers to obtain the purported membership benefits, they must contact defendant MWI either by telephone or via the Internet, and obtain certificates through MWI. If the retail establishment works with MWI, then the consumer can order a certificate that can be used at that retail establishment. Unless the consumer knows to call MWI, they receive nothing.[7]

56. In the *West* Action, MWI produced a database containing the transactions of 567,430 California consumers, many of whom are members of the class. Some of these consumers were enrolled under West's Joint Venture and Wholesale arrangements with MWI, which were settled in the *West* Action and for which no recovery is sought in this action. The database establishes that 552,605 (or 97.5%) of the consumers included in this database never used any membership benefits.

---

[7] Some coupons of nominal value are included in some membership kits. However, Defendants pitch their reward program as the biggest member benefit and the reward program requires the "member" to contact MWI to use it.

- 19 -

The database establishes that out of 567,430 consumers included in the data, only one person purchased any of the following membership benefits:

| | |
|---|---|
| $25 Exxon Gas Card | $25 WalMart Gift Card |
| $25 Gas Card Choice A | $25 Babies R Us Gift Card |
| $25 Warner Bros. Certificate | $25 SunCoast Gift Card |
| $25 Hollywood Video Gift Cards | Hickory Farms Offer |
| Lady Footlocker Merchandise Certificate | Sharper Image Coupon |

57. The database establishes that out of 567,430 consumers *only two people* bought one or more of the following:

| | |
|---|---|
| ARCO Gas Cards | $25 Structure Certificates |
| $10 Olive Garden Gift Cards | $25 Bloomingdales Certificates |
| Zales Certificates | |

58. Out of 567,430 consumers *only three people* bought one or more:

| | |
|---|---|
| $10 Toys R Us Certificates | $25 Borders Gift Cards |
| $25 Barnes and Nobel Gift Certificates | |

59. Out of the 567,430 consumers, four people bought one or more $25 Toys R Us Gift Cards or a $10 Applebees Certificates; five bought a GNC Coupon; eight bought a $10 Blockbuster Gift Card or a $25 Linens-N-Things Gift Card; ten bought a $25 Sam Goody Gift Card, a $25 K-Mart certificate or a $10 Red Lobster/Olive Garden Certificate; 11 bought a $10 Outback Steak House Certificate or a $25 Lowes Gift Card; 12 bought a $25 KB Toys Gift Card; 16 bought a Pier 1 Gift Card; 17 bought a $25 Footlocker Certificate; 26 bought a $25 Home Depot Gift Certificate; 28 bought a $25 Sears Certificate; 35 bought a Nordstrom Gift Certificate; 36 bought a $25 TJ MAXX Certificate; and just 152 people bought a $25 Target gift card. Equally significant, the most purchased benefits were purchased by less than one percent of the 567,430 consumers – just 0.4% (2,250 people) received one or more $40 Hair Cut Rebates and just 0.7% (4,063 people) received 4/$5 Dining Rebates.

60. As part of its investigation, the Iowa Attorney General sent questionnaires to 400 Iowa residents enrolled in MWI membership programs. The Iowa Attorney General reported that,

most of the consumers who responded indicated that they had never used their membership and none of those responding said they were satisfied members.

61.     The lack of use of the membership benefits demonstrates that Defendants knew, or should have known that the people they charged $60-$150 were utterly unaware that they had been charged for and enrolled in the MWI memberships. Consumers were treating the membership kit as the law allows; they were ignoring it and assuming they had no obligation to the sender of the unordered merchandise. Defendants charged them and took their money in violation of law.

**Consumer Complaints**

62.     Immediately after the first customers were charged for an MWI membership, Defendants began receiving an enormous number of customer complaints. These complaints ranged from the consumers having no recollection of ever being told about an MWI program to irate consumers alleging theft and fraud by Defendants. A simple Internet search for "MemberWorks," pulls up thousands of consumer complaints, including at websites such as www.ripoffreport.com, www.consumeraffairs.com and www.uspeakout.com. Despite receiving such complaints and despite knowing of the existence of a number of Internet sites dedicated to complaining about MWI and its unlawful practices, Defendants took no steps to make sure that their marketing practices were not deceptive.

63.     In addition to complaints directly by consumers, MWI received numerous inquiries by the Better Business Bureau (the "BBB") regarding its practices as they related to customers. Defendant MWI received an unsatisfactory rating by the BBB due to a pattern of complaints concerning unauthorized charges to consumers' credit cards. The BBB's website reported on June 30, 2006 that it had processed a total of 2,277 complaints about MWI in the previous 36 months, including 765 in the previous year. The conduct giving rise to these complaints continues.

- 21 -

Almost one year later, on June 2, 2007, the BBB's website reported that it had processed a total of 2,180 complaints about MWI in the previous 36 months, including 667 in the previous year.

64.     Defendants received so many complaints from consumers that they scripted responses to "frequently asked questions" or "FAQs" for their customer service representatives. The following "frequently asked questions" were received by Defendants who prepared scripted responses to them:

(a)     "I received my credit card bill and saw this Essentials or Home & Garden Rewards program listed here for $84 – what is this";

(b)     "I don't remember hearing about Essentials or Home & Garden Rewards";

(c)     "I said 'no' to this program";

(d)     "I didn't authorize this program"; and

(e)     "Who authorized this billing/purchase?"

65.     The conduct of each of the Defendants contributed to the scheme designed to deceive and defraud class members, resulting in the unlawful assessment of an unsolicited annual recurring membership fee.

**Governmental Actions**

66.     Every governmental and judicial entity to review Defendants' telemarketing practices has concluded they are deceptive and misleading.

67.     Seven attorneys general (from Minnesota, New York, Nebraska, California, Florida, Ohio and Iowa) have separately concluded that the telemarketing scheme Defendants employed was deceptive. In the words of the Minnesota Attorney General:

"They just say at the end of the script so we're going to send you the package in the mail ok and they never say Is it OK to charge your credit card? . . . [The Telemarketers] tell you that the deal is about you getting something for nothing . . . . You're going to get a free gift, you're going to get a risk-free membership and that's

- 22 -

not what the real deal is. The real deal is you're going to get charged unless you act to cancel that."[8]

68.     According to the New York Attorney General:

Consumers may be confused and mistakenly believe that (1) their credit card or bank card accounts will not be debited unless they directly provide their billing information to MW; (2) they do not have to take any affirmative action to avoid being charged a membership fee; (3) they do not have to take any affirmative action to avoid being charged a renewal fee upon expiration of the initial membership term; and (4) they are not making a purchasing decision at the time of the telemarketing call.

69.     The New York Attorney General also charged that:

Because the trial offer is termed "risk free," Consumers may be confused or fail to understand that they will be charged a membership fee unless they cancel their membership before the end of the trial offer. By reason of the foregoing, the Attorney General believes that MW has engaged in business conduct that has the tendency and capacity to be deceptive and misleading in violation of New York's consumer protection laws.

70.     As a result of the Minnesota and New York Attorneys General investigations, MWI

was forced to stop reading its scripts to Minnesota and New York consumers until the scripts were

revised to: (i) inform consumers that they would be billed after 30 days if they did not call to cancel;

and (ii) ask the consumers' permission to charge their credit and/or debit cards. While in 2001 MWI

ultimately revised the scripts in Minnesota and New York, it did not include similar disclosures on

any of its scripts read in any other state.

71.     Following on the Minnesota and New York investigations the Nebraska Attorney

General implemented an investigation into the deceptive telemarketing practices. As a result, MWI

was required to modify its scripting nationwide to inform consumers that they would be billed after

30 days if they did not call to cancel; ask their permission to charge their credit and/or debit cards.

The new scripting requirements were referred to as "Best Practices" requirements or "Best Practices"

---

[8]     *Why Some U.S. Flag Buyers Are Seeing Red*, ABC News.com, Nov. 28, 2001.

scripting. Prior to the June 1, 2001 deadline for implementing the Best Practices scripting, MWI tested the disclosures on several "bait" products. The results were dramatic as affirmative responses to the telemarketing script dropped to nearly zero. In response to the test results, MWI secured an extension of the implementation date, and returned to using the old deceptive scripting to maximize their "sales."

72.     In 2001, MWI also entered a settlement with the California Attorney General relating to the sale of MWI memberships to consumers who called to purchase unrelated products from Sears. Under the settlement, MWI agreed to pay an unprecedented $2 million fine. MWI also agreed to use the Best Practices scripts in California, and to send renewal notices to California residents that they would be charged unless they called to cancel.

73.     On information and belief, in order to circumvent the scripting requirements required by the Nebraska, Minnesota, New York, Florida and California Attorneys General, MWI hatched a scheme to allow it to continue its deceptive telemarketing practices. Without discussing the matter with any of the attorneys general, MWI and certain of the Telemarketers took the position that the Best Practices requirements did not apply to enrollments originated by the Telemarketers. This meant that while Best Practices scripting would have to be used where MWI simply paid a fee to the Telemarketers to read the scripts and where consumers were enrolled under the joint venture arrangements with the Telemarketers, the old deceptive scripting would continue to be read by Telemarketers having wholesale arrangements with MWI. Certain of these Telemarketers would then turn around and "sell" the enrolled consumers back to MWI who would bill the credit and/or debit cards of consumers for the bogus memberships.

74.     On October 21, 2003, the Florida Attorney General filed a complaint concerning Defendants' deceptive telemarketing practices. Noting that MWI reported annual revenue of $400 million, the Florida Attorney General's Office indicated its investigation estimated that 50% of all

- 24 -

sales were reported as "unauthorized." In 2004, MWI also entered into a settlement agreement with the Florida Attorney General relating to the sale of its products in conjunction with unrelated infomercial products. MWI agreed to pay a $950,000 fine. The agreement also required MWI to clearly disclose all terms and conditions of its programs, and to obtain consumers' express consent to charge their credit cards for MWI programs.

75.    The Iowa Attorney General filed suit on May 11, 2006.

76.    As part of its investigation, the Iowa Attorney General sent questionnaires to 400 Iowa residents enrolled in MWI membership programs. Among the questionnaire respondents, 67% indicated that they did not know they were members and/or that they did not authorize MWI to charge them. The Iowa Attorney General reports that: "Most of the rest of the consumers who responded indicated that they had never used their membership, or thought that they had already cancelled. None of those responding said that they were satisfied members."

77.    In 2002, the Federal Trade Commission (the "FTC") published its Notice of Proposed Rulemaking (the "Notice") pertaining to telemarketing sales rules stating "in many preacquired account telemarketing solicitations, products and services (often buyers' clubs) are marketed through the use of free trial offers, which are presented to consumers as 'low involvement marketing decisions.'" *See* 67 Fed. Reg. 4492, 4501 (Jan. 30, 2002). The Notice went on to state, "[c]onsumers are asked merely to consent to the mailing of materials about the offer. Consumers frequently do not realize that the seller or telemarketer already has their billing information in hand and, instead, mistakenly believe they must take some action before they will be charged – *i.e.*, that they are under no obligation unless they take some additional affirmative step to consent to the purchase." *Id.*

78.    In 2003, the FTC enacted rules to combat "abusive telemarketing . . . practices" by telemarketers using a "free-to-pay conversion feature" when the telemarketers have "pre-acquired

- 25 -

account information." *See* 16 C.F.R. §310.4. Significantly, in adopting these rules, the FTC included defendants Memberworks Incorporated among a list of "bad actors" charged with engaging in this type of abusive telemarketing practices. 68 Fed. Reg. 4580, 4621, n.472 (Jan. 29, 2003). The rule sets forth three objective requirements which, at a minimum, must be satisfied to meet the FTC's informed consent requirement. MWI would have had to "obtain *from the customer*, at a minimum, the last four (4) digits of the account number to be charged." 16 C.F.R. §310.4(a)(6)(i)(A). It would have had to "obtain *from the customer* his or her express agreement *to be charged* for the goods or services *and to be charged using the account number* [identified by the customer]." 16 C.F.R. §310.4(a)(6)(i)(B). And MWI would have had to "make and maintain an audio recording of the entire telemarketing transaction." 68 Fed. Reg. 4580, 4621 n.471 (Jan. 29, 2003). In order to circumvent these requirements, MWI began charging $1 for the 30-day trial so that at the end of 30 days, there would not be a "pay to pay" conversion.

79. In connection with the rule-making proceedings, MWI submitted a purported consumer survey on the understandability of the telemarketing scripts. The FTC concluded that MWI's survey was biased in its favor and that even in the face of this bias the study demonstrated that "at least 46 percent of the respondents did not even 'mostly' understand the way in which they would be billed after listening carefully to a sales offer involving preacquired account information and a 'free-to-pay conversion' feature." 68 Fed. Reg. 4580, 4621 n.468 (Jan. 29, 2003).

80. In the *Sanford* Federal Class Action, after weighing the evidence and expert testimony submitted, the federal arbitrator concluded:

> When I look at the overall picture here from an objective reasonable person viewpoint I consider: the experience that MWI has had in thousands of these cases, the circumstances of this type of call (an unsolicited, unexpected offer read by MWI with high sounding words such as "RISK-FREE" membership – "YOU WON'T BE BILLED" – "So, look for this kit in the mail, OKAY?"), *I conclude that even if the script was read to [the consumer], [they were] misled, [they] didn't agree to this "deal," there was no meeting of the minds*, and MWI not only could suspect, but

- 26 -

knew that many of the callers did not understand that they were making a "deal" to purchase a membership and assuming a burden to act.

Arbitration Award at 6-7.

81.     In reaching this conclusion, the arbitrator stated: "I conclude that the script has fuzzy language, would have been read in less than 30 seconds (my estimate) as a fast sell over the phone for a product that had nothing to do with the purpose of [the consumer's] call. The script, if it was read to [the consumer], was *foisted upon [them] in a quick, slick and misleading sales pitch that few people would understand.*" *Id.* at 7. Ultimately, he found: "*This script is a recipe for misunderstanding and confusion when heard by a consumer hearing it under the circumstances.*"

*Id.* at 8.

82.     In the *Ritt* action, the Ohio Court of Appeals found the upsell scripts were deceptive and misleading:

> The fact is, with or without authorization, consumers who stayed on the telephone line long enough to receive the entire scripted pitch would not have known the ramifications of what they were agreeing to once the upsell had been pitched to them and they said "yes" to receiving a membership kit.[9]

## TOLLING OF THE STATUTE OF LIMITATIONS

83.     The running of any applicable statutes of limitation has been tolled for several reasons.

### Tolling by Virtue of MWI's Fraudulent Concealment

84.     Through various techniques and devices of secrecy, deception and misrepresentation, Defendants affirmatively and intentionally concealed the existence of their unlawful and unfair telemarketing practices from Plaintiffs, class members and the public. The fraudulent concealment, deception and misrepresentation existed before Plaintiffs were enrolled and charged and continued

---

[9]     *Ritt v. Billy Blanks Enters.*, No. 80983, 2003 Ohio App. LEXIS 3297, at *7, *20-*21 (Ohio Ct. App. July 10, 2003).

throughout the class period. Defendants carried out their violations of law in secret and consistently deceived, misrepresented and concealed the truth regarding the unauthorized enrollment into the various membership programs and the unauthorized charging of Plaintiffs' and class members' credit and/or debit cards. Such acts included purposely designing their scripts to maximize consumers' confusion, thus allowing Defendants to enroll the maximum number of unsuspecting consumers.

85.     Defendants' scheme is based upon their knowledge that a large segment of the consumer population does not check their credit card statements and/or would miss the charge even if they did review their credit card statement.

86.     So as to assuage any suspicion that a consumer may have, Defendants emphasize that the trial membership they are sending is "FREE" and that the class members "WON'T BE BILLED."

87.     To conceal the fact of billing consumers' credit and/or debit cards, Defendants intentionally did not send Plaintiffs or class members any invoice or any other notification that they were going to charge their cards. Similarly, to conceal the true facts concerning the billing of the consumers' credit and/or debit cards, after they billed the consumers' credit and/or debit cards, Defendants did not send any invoice, or notification of the fact that they had in fact billed the class members' cards.

88.     Another method that Defendants used to conceal their wrongful practices from Plaintiffs and the class was to reverse the charges for any consumer that is able to track down the source of the illicit charge and calls to complain. After reading scripts in an attempt to keep the consumer enrolled, Defendants and/or their agents will reverse the charges for complaining consumers so that the complaints do not get escalated to the point that their practices become common knowledge and reach the ears of the consumers they illicitly enrolled in, and charged for,

- 28 -

the bogus programs. Further evidence of this concealment is demonstrated by the existence of a Frequently Asked Questions script providing their telephone operators and/or operators of their agents, with scripted answers to consumer questions/statement such as "I did not authorize this charge," "how did you get my credit card number" and "what is this program," among others.

89.    To further conceal their wrongful conduct from those consumers who do review their credit card statements, Defendants intentionally charged $60-$150 – amounts that were unlikely to rouse suspicion from the consumer and provoke any further inquiry. Indeed, had Defendants billed the consumers' credit and/or debit cards for several hundred dollars, consumers would be more likely to notice the illicit charges and seek to have them reversed. Similarly, the identification of the charges was designed to conceal the illicit nature of the subject charges, as the charges were identified by such words as "Essentials," "Value Max," "Travel" and "Home and Garden," among others. A consumer who reviewed his or her statement seeing a charge for $75 to "Essentials," for example, would likely perceive such name to be a clothing store, curio store, drug store or other retail establishment from which his or her spouse would have made a purchase, and thus not pursue any further inquiry to determine if the charge was legitimate or fraudulent.

90.    Through such acts of fraudulent concealment, even assuming that a class member noticed the charge on their credit or debit card statement, the existence of a charge for Essential, Value Max, Travel, Home & Garden or others would not provide any indication to the class member that their card was fraudulently charged.

91.    Defendants' scheme worked perfectly on Plaintiffs and the class members. Succumbing to Defendants' practices of fraudulent concealment described above, Plaintiffs did not notice the fraudulent charges when they were originally enrolled, and charged, by Defendants. Accordingly, until recently Plaintiffs had absolutely no knowledge they had previously been billed approximately $180.00 in membership fees. In addition, while class members and consumers may

- 29 -

recall contacting Defendants regarding a renewal charge, on information and belief it was Defendants' policy, regarding renewal charges, not to inform consumers this was a "renewal" charge and that they had previously billed one or more times earlier.

92.    By virtue of their pervasive deception and misrepresentation and concealment of facts, Defendants successfully concealed from Plaintiffs and class members the truth about the memberships thereby tolling the running of any applicable statutes of limitation. Plaintiffs and class members were unaware of, and through the exercise of due diligence could not have discovered, the existence of such violations until after they had been charged for the membership.

93.    In the alternative, based on the facts alleged herein, Defendants are estopped from relying on any statutes of limitation because of their fraudulent concealment, deception and misrepresentation of facts regarding the enrollment into the membership programs and unauthorized charges. They were under a duty to disclose this information because it is non-public information over which Defendants had exclusive control, because Defendants knew this information was not available to Plaintiffs and class members and because this information was crucial to the consuming public in making purchasing decisions.

## Tolling by Reason of Prior Class Action Pending

94.    This is a related case to the *Sanford* Federal Class Action. The *Sanford* Federal Class Action was filed on March 28, 2002. In addition to federal claims, the *Sanford* Federal Class Action originally included these state law claims. The state law claims were finally dismissed from the federal action on December 23, 2008. Under established case law, the filing of the *Sanford* Federal Class Action against MWI tolls all statutes of limitation until a final judgment of dismissal, which is no longer subject to additional appeals, has been entered.

95.    The court in the *Sanford* Federal Class Action issued an order on September 29, 2008, granting defendants' motion to dismiss the federal claims, and refusing to exercise supplemental

- 30 -

jurisdiction over plaintiff Patricia Sanford's and the class members' state law claims. Furthermore, relying on *Wright v. Schock*, 742 F.2d 541, 545 (9th Cir. 1984) (citing *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 352-53 (1983)), the federal court held the pendency of the federal action "tolled the statute of limitations for individual claims, mitigating prejudice to members of the putative class."

96.    On October 14, 2008, plaintiffs filed an *ex parte* application for reconsideration, asking the federal court for leave to amend the complaint, which application was granted on November 3, 2008, directing plaintiffs to file a motion for leave. On November 17, 2008, plaintiffs filed the motion for leave to amend. On December 16, 2008, defendants filed an *ex parte* motion to dismiss or, in the alternative, to strike, among other things, the state law claims from the proposed amended federal complaint, arguing that "the Court previously dismissed numerous state law claims without prejudice, and thus the state law claims can be pursued in the appropriate state court(s)." MemberWorks Inc.'s Memorandum of Points and Authorities in Support of *Ex Parte* Application for Dismissal or, in the Alternative, to Strike Claims and Additional Parties at 8. On December 23, 2008, the federal court struck the state law claims from the proposed amended complaint, holding: "Furthermore, dismissing the action would not preclude Plaintiffs from pursuing relief in other venues. The Court has not precluded the Plaintiffs from pursuing its state law claims in state court." Order Striking Counts I, IX, X, and XI from the Proposed TAC Attached to Plaintiffs' Motion for Leave to Amend at 4.

97.    As the above facts establish, Defendants have at all times known the core facts concerning the claims for which Plaintiffs and the class members seek to hold them accountable. Defendants have also known that at no time have Plaintiffs ever intended to drop the claims asserted against them. Accordingly, there is no prejudice to Defendants in permitting Plaintiffs and the class members to proceed with this action and prosecute their rights against Defendants.

- 31 -

## CLASS ACTION ALLEGATIONS

98.     Plaintiffs bring this class action pursuant to Superior Court Civil Rule 23, on behalf of themselves and all other persons similarly situated in the District of Columbia. The class which Plaintiffs represent is composed of all persons in the District of Columbia who, after calling a telephone number to inquire about or purchase another product: (i) were sent a membership kit in the mail; and (ii) were charged for an annual MWI membership program (the "Class"). Excluded from the Class are all persons enrolled in an MWI program under the March 16, 1998 "Joint Marketing Agreement between West Telemarketing Corporation and MemberWorks Incorporated," and/or the January 1, 1999 "Agreement" between West Telemarketing Corporation and MemberWorks Incorporated, and/or the July 1, 1999 "Joint and Wholesale Marketing Agreement" between West Telemarketing Corporation, West Teleservices Corporation and MemberWorks Incorporated and/or the December 1, 2001 "Wholesale and Retail Marketing Agreement" between MemberWorks Incorporated and West Direct, Inc., and any amendments or addendums to these agreements.[10] Not included within the Class are Defendants and their officers, directors, employees, agents and/or affiliates.

99.     The Class is composed of hundreds of thousands of persons geographically dispersed throughout the District of Columbia, the joinder of whom in one action is impracticable, and the disposition of their claims in a class action will provide substantial benefits to both the parties and the Court.

---

[10]     The information regarding these unnamed class members was obtained pursuant to a protective order and is required to be filed under seal. If the Court desires, Plaintiffs will amend this complaint to add these additional unnamed class members.

100.    The Class is ascertainable and maintains a sufficient community of interest since the

rights of each member of the Class were violated in a similar fashion based upon Defendants' use of

a uniform script that was read to the class members.

101.    The victimized consumers can be identified in the databases maintained by MWI.

More specifically, MWI maintains databases that contain the following information: (i) the name of

each class member "enrolled" in an MWI program via an inbound call; (ii) the address of each such

class member; (iii) the date each class member was enrolled; (iv) the date and amount each class

member was charged; and (v) the date and amount each class member was refunded. Thus the class

members can be located and notified with specificity of the pendency of this action using techniques

and a form of notice customarily used in class action litigation.

102.    Plaintiffs' claims are typical of the members of the Class as a whole because of the

similarity, uniformity and common purpose of the unlawful conduct of Defendants. Each class

member was read the subject "upsell" script. Each class member was mailed a membership kit for

an MWI membership program. Each class member has sustained damage as a result of Defendants'

wrongful conduct in violation of state statutes, state common law, as well as general principles of

equity and fair play.

103.    Plaintiffs will fairly and adequately protect the members of the Class as Plaintiffs

have retained competent counsel who are experienced in federal and state class action claims such as

those asserted in this case.

104.    A class action is superior to all other methods for the just, fair and efficient

adjudication of this controversy since joinder of all members is impracticable. Furthermore, the

damages suffered by individual class members are not sufficient to justify the enormous cost

associated with the prosecution of this type of litigation. The expense and burden posed by such

individual litigation makes it impossible for the class members to individually redress the wrong

- 33 -

done to them, nor would such an individual case be adequate to ensure that such practices cease to harm others. Further, there will be no difficulty in the management of this action as a class action.

105.    Common questions of law and fact exist as to all members of the Class and these common issues predominate over any questions which go particularly to any individual member of the Class. Among such common questions of law and fact are the following:

(a)    did Defendants mail memberships to the class members without obtaining prior express consent or acceptance;

(b)    were the subject "upsell" scripts deceptive;

(c)    did Defendants clearly and unambiguously communicate that the class members would be charged unless they called Defendants to cancel the "risk-free" trial membership;

(d)    were the membership materials deceptive;

(e)    did Defendants act willfully or recklessly;

(f)    did Defendants' acts, as alleged herein, violate federal statutes, District of Columbia statutes and/or general principles of equity and fair play;

(g)    whether the Defendants engaged in a pattern and practice of deceiving and defrauding the Class and concealing their unlawful conduct;

(h)    whether the Defendants violated state consumer protection statutes;

(i)    what amount of damages the Class sustained as a result of Defendants' wrongful conduct, and the proper measure of such damages;

(j)    what restitution is due class members; and

(k)    whether Plaintiffs and members of the Class are entitled to an award of reasonable attorneys' fees, prejudgment interest, post-judgment interest, costs of suit and other appropriate relief under the circumstances of this case.

- 34 -

**FIRST CAUSE OF ACTION**
**For Violation of the District of Columbia Consumer Protection Procedures Act**
**(On Behalf of Plaintiffs and the Members of the Class)**

106.    Plaintiffs hereby reallege and incorporate by reference the allegations contained in ¶¶1-105 above.

107.    This claim arises under CPPA, D.C. Code §§28-3901-28-3911 *et seq*.

108.    The CPPA is a broad act intended to protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive or unfair acts or practices in the course of any trade or commerce.

109.    D.C. Code §28-3905(k)(1) states, "[a] person, whether acting for the interests of itself, its members, or the general public, may bring an action under this chapter in the Superior Court of the District of Columbia seeking relief from the use by any person of a trade practice in violation of a law of the District of Columbia."

110.    The term "'trade practice' means any act which does or would create, alter, repair, furnish, make available, provide information about, or, directly or indirectly, solicit or offer for or effectuate, a sale, lease or transfer, of consumer goods or services." D.C. Code §28-3901(a)(6).

111.    The term "'merchant' means a person . . . who . . . does or would sell, lease (to), or transfer, either directly or indirectly, consumer goods or services, or a person who . . . does or would supply the goods or services which are or would be the subject matter of a trade practice." D.C. Code §28-3901(a)(3).

112.    A "'consumer' means a person who does or would purchase, lease (from), or receive consumer goods or services, including a co-obligor or surety, or a person who does or would provide the economic demand for a trade practice; as an adjective, 'consumer' describes anything, without exception, which is primarily for personal, household, or family use." D.C. Code §28-3901(a)(2).

- 35 -

113. Plaintiffs and class members are "consumer[s]" and/or "persons" within the meaning of D.C. Code §§28-3901(a)(2) and 28-3905(k)(1).

114. Defendants' conduct involves a consumer transaction for "personal, household, or family use." D.C. Code §28-3901(a)(2).

115. CPPA recognizes explicitly that the "'goods and services'" involved in a consumer transaction may concern "any and all parts of the economic output of society, . . . includ[ing] consumer credit, franchises, business opportunities, real estate transactions, and consumer services of all types." D.C. Code §28-3901(a)(7).

116. At all times relevant, Defendants engaged in deceptive acts, omissions, conduct or misrepresentations, as part of trade or commerce within the District of Columbia and/or had an impact within the District of Columbia within the meaning of CPPA, for that statute applies whether a merchant makes a sale to a consumer directly or indirectly. MWI was a seller of the product to Plaintiffs and class members and Plaintiffs and class members suffered substantial loss because of one or more of Defendants' deceptive acts or omissions.

117. The policies, acts and practices of Defendants as described above were intended to deceive, deceived and continue to deceive Plaintiffs, members of the Class, and the general public as described herein and have resulted (and will result) in annual fees being imposed on members of the Class and offend the District of Columbia's public policy.

118. The acts, omissions, misrepresentations, policies, practices and non-disclosures as alleged herein were intended to, and did, result in the sale of the products at issue to Plaintiffs and the Class and violated and continued to violate CPPA, D.C. Code §§28-3901-28-3911 *et seq*.

119. It shall be a violation of CPPA, whether or not any consumer is in fact misled, deceived or damaged thereby. Defendants, in connection with the advertising, tender and/or delivery of the products at issue, employed unconscionable tactics and inserted unconscionable provisions

- 36 -

into the sales of the products at issue herein by unilaterally attempting to impose an automatic, unauthorized fee for enrollment in a fictitious and/or useless and unwanted membership which is offensive to the District of Columbia's public policy and constitutes unfair and deceptive methods of competition in violation of one or more of the following:

(a)     in violation of D.C. Code §28-3904 of the CPPA, Defendants' acts and practices constitute the use of deceptive representations in connection with the products in question;

(b)     in violation of D.C. Code §28-3904(e) of the CPPA, Defendants have made false or misleading representations of material fact concerning the nature of the transaction or obligation incurred concerning the products at issue which have a tendency to mislead;

(c)     in violation of D.C. Code §28-3904(f) of the CPPA, Defendants have made false or misleading representations and failed to state material fact concerning the nature of the transaction or obligation incurred concerning the products at issue and such failure tends to mislead;

(d)     in violation of D.C. Code §28-3904(h) of the CPPA, Defendants' acts and practices constitute the advertisement or offer of goods or products without the intent to sell them as advertised or offered;

(e)     in violation of D.C. Code §28-3904(q) of the CPPA, Defendants fail to supply to a consumer a copy of a sales or service contract, lease, promissory note, trust agreement or other evidence of indebtedness which the consumer may execute; and

(f)     in violation of D.C. Code §28-3904(r) of the CPPA, Defendants inserted unconscionable provisions into the sales contracts at issue herein by unilaterally attempting to impose an automatic, unauthorized fee for enrollment in a fictitious membership. The following factors may be taken into consideration, as well as other factors in violation of D.C. Code §28-3904:

(i)     knowledge by the person at the time of the sale or lease of the inability of the consumer to receive substantial benefits from the property or services sold or leased; and

- 37 -

(ii)      that the person has knowingly taken advantage of the inability of the consumer reasonably to protect his or her interests by reasons of inability to understand the language of the agreement, or similar factors.

120.    Furthermore, the acts, omissions, misrepresentations, policies, practices and non-disclosures of Defendants as alleged herein were willful, intentional, malicious, immoral, unethical, unscrupulous or oppressive and constituted violations under CPPA, D.C. Code §§28-3901-28-3911 *et seq.* as:

(a)    Defendants have made false or misleading representations concerning the offering price of, or the person's cost for the products at issue;

(b)    Defendants have used Plaintiffs' and class members' credit and/or debit cards with the intent to injure and/or defraud Plaintiffs and class members by the unauthorized use of Plaintiffs' and class members' credit and/or debit cards in regards to the products at issue;

(c)    Defendants' unfair or deceptive acts or trade practices, of knowingly and willfully enrolling, charging and collecting an invalid and illegal membership fee from Plaintiffs and all putative class members, are immoral, unethical, oppressive, despicable, reprehensible, unscrupulous and have and continue to cause substantial financial injury;

(d)    Defendants' use of bait products to promote the sale of the products at issue through false and deceptive representations;

(e)    Defendants knowingly concealed, suppressed and omitted in their scripts, advertisements and membership kits, material facts about the deceptive products at issue with the intent that Plaintiffs and the Class would rely upon the concealments, suppressions or omissions; and

(f)    MWI profited at the expense of Plaintiffs and the Class by systematically enrolling them in a MWI program and charging their credit and/or debit cards without their authorization.

- 38 -

121.   By reason of the foregoing, Plaintiffs, members of the Class and the general public have been (and will continue to be) irreparably harmed.

122.   Defendants' conduct also violates CPPA in that Defendants either were or reasonably should have been aware that imposition of such representations and fees is unfair, unlawful and/or fraudulent under the circumstances.

123.   Injuries suffered by Plaintiffs and the Class were not outweighed by any countervailing benefits to Plaintiffs and class members.

124.   At all times material to this Complaint, Defendants were acting for financial gain within the meaning of CPPA.

125.   Through the unauthorized enrollment into the products at issue, Plaintiffs and the Class were subjected to unauthorized charges to their credit and/or debit cards thereby suffering "ascertainable and quantifiable losses" as a result of Defendants' unlawful, unfair and fraudulent business practices in violation of CPPA.

126.   As a direct and proximate result of Defendants' violations of CPPA, Plaintiffs and class members have suffered losses and are entitled to the statutory damages, punitive damages and injunctive relief provided in D.C. Code §28-3905.

127.   The conduct of Defendants, as set forth herein, was unlawful, unfair, immoral, unscrupulous, deceptive and/or fraudulent and constitutes unfair and deceptive acts in violation of CPPA, D.C. Code §28-3901 *et seq.*

128.   Plaintiffs reserve the right to allege other violations of law which constitute unlawful business acts or practices. Defendants continue to posses funds that belong to the class members, to this date.

- 39 -

## SECOND CAUSE OF ACTION
### For Conversion
### (On Behalf of Plaintiffs and the Members of the Class)

129. Plaintiffs hereby reallege and incorporate by reference the allegations contained in ¶¶1-128 above.

130. Defendants have converted to their own use, property belonging to Plaintiffs and members of the Class through unlawful acts and conduct. The specific sum of money that was converted by Defendants should be readily identifiable from information and records in Defendants' possession or control.

131. Defendants knowingly or intentionally charged and collected money for unordered merchandise from credit and/or debit card accounts of consumers, including Plaintiffs and members of the Class. Defendants obtained money from consumers through fraud and/or deception. Defendants thus converted to their own use property, specifically monies, belonging to Plaintiffs and the Class.

132. The specific sum of money of Plaintiffs and members of the Class that was converted by Defendants are readily identifiable from information and records in Defendants' possession or control.

133. As a direct and proximate result of Defendants' unlawful acts and conduct, Plaintiffs and the Class were deprived of the use of their money that was unlawfully converted by Defendants, and are thereby entitled to restoration of their monies, interest on these monies from the date said monies were converted by Defendants to the date of judgment, compensatory damages (including overdraft fees paid by consumers due to Defendants' conversion of their money) and punitive damages.

## THIRD CAUSE OF ACTION
### For Unjust Enrichment
### (On Behalf of Plaintiffs and the Members of the Class)

134.    Plaintiffs hereby reallege and incorporate by reference the allegations contained in ¶¶1-133 above.

135.    Defendants have received, and continue to receive, a benefit at the expense of Plaintiffs and members of the Class.

136.    Defendants have fraudulently and/or deceptively charged and collected membership fees and/or renewals from consumers, including Plaintiffs and members of the Class, for unordered merchandise. Accordingly, Defendants have received benefits which they have unjustly retained at the expense of Plaintiffs and members of the Class.

137.    As a direct and proximate result of Defendants' unlawful acts and conduct, Plaintiffs and members of the Class were deprived of the use of their money that was unlawfully charged and collected by Defendants, and are therefore entitled to restoration of their monies.

## FOURTH CAUSE OF ACTION
### For Fraud and Deceit
### (On Behalf of Plaintiffs and the Members of the Class)

138.    Plaintiffs hereby reallege and incorporate by reference the allegations contained in ¶¶1-137 above.

139.    The acts, conduct and practices of Defendants, as alleged above, were fraudulent and deceptive. The use of deceptive scripts assuring consumers that they were being mailed a free 30-day trial membership is and was likely to mislead, and did in fact mislead, Plaintiffs and members of the Class.

140.    Plaintiffs and members of the Class ordered non-MWI products. Approximately one month later, class members were enrolled in an MWI membership program and were charged an approximate amount of between $60 and $150 to their credit or debit cards. Eleven months after the initial charge, Defendants charge the class members approximately the same amount (usually 15%-

25% more) without seeking any approval to do so. These charges, if undetected, will keep occurring in subsequent years.

141.   Through the use of deceptive scripts that were read to the class members, Defendants concealed material facts from Plaintiffs and the Class. Defendants tell and have told members of the Class that they are being mailed a risk-free 30-day trial membership. No permission to use the consumers' credit and/or debit cards is sought or obtained. The scripts deceive members of the Class. After mailing the unsolicited membership kit to the class members, Defendants charge the members of the Class for an unsolicited and unwanted membership.

142.   Defendants falsely and fraudulently utilize deceptive scripts that conceal from the class members that they will be automatically charged unless the class members affirmatively call Defendants to cancel the membership. Defendants' scripts contain misrepresentations and are intended to, and do, deceive the class members.

143.   Defendants intentionally designed the scripts and the purported membership material in order to mislead the class members into believing that they would receive a risk-free trial membership that they could try out, and if they liked the membership, the class members could contact Defendants to activate a full membership. The true facts are just the opposite – Defendants charge the class members unless they call to cancel.

144.   Defendants have intentionally designed the generic membership materials so as to appear to be "junk mail" in the hopes that the materials will be discarded and thus never read. If the packet mailed by MWI for the risk-free trial membership is thrown out by the recipient, then the consumer will not have the number to access the benefits. The kits are mailed out bulk rate indicating the lack of value of the material. In this way, Defendants further conceal the fact that the class members will be charged an annual, self-renewing membership fee.

- 42 -

145. To further their scheme to conceal the true facts, Defendants never send any invoice or bill to Plaintiffs and the class members informing them that their credit and/or debit cards were going to be, or were in fact, charged.

146. Defendants' renewal of the purported memberships is fraudulently concealed by Defendants in the same manner. No bill or invoice is sent to the class members informing them that they were going to be, or had in fact been, charged.

147. Plaintiffs and members of the Class reasonably relied on Defendants and believed that they were making a one-time purchase of non-MWI products.

148. Defendants' false and misleading statements and suppression of the material facts set forth above and throughout this Complaint defrauded Plaintiffs and the Class, and are in direct violation of federal and state statutes, as well as principles of common law, for which Plaintiffs and members of the Class are entitled to recover damages, including punitive damages.

## FIFTH CAUSE OF ACTION
### For Negligent Misrepresentation
### (On Behalf of Plaintiffs and the Members of the Class)

149. Plaintiffs hereby reallege and incorporate by reference the allegations contained in ¶¶1-148 above.

150. In making representations to Plaintiffs and members of the Class described herein, Defendants failed to fulfill their duty to disclose the material facts set forth above. Among the direct and proximate causes of said failures to disclose were the negligence and carelessness of Defendants.

151. Defendants owed Plaintiffs and members of the Class the duty to act with reasonable care in retaining, training and supervising their agents and sales agents. Defendants also failed to take reasonable steps to ensure that their representatives conducted themselves in accordance with the law and to ensure that the representatives disclosed all material facts and did not misrepresent or omit such facts in conducting such sales.

- 43 -

152. Defendants, as set forth herein, breached their duties to retain, train, supervise and discipline their sales force and to ensure full disclosure by them.

153. Plaintiffs and the members of the Class were unaware of the falsity of Defendants' affirmative misrepresentations and their failure to disclose that Plaintiffs and members of the Class would be charged undisclosed and unauthorized fees for a fictitious membership on their credit card accounts. Plaintiffs and the members of the Class, as a direct and proximate cause of Defendants' breaches of their various duties, reasonably relied upon such representations to their detriment. By reason thereof, Plaintiffs and members of the Class have suffered damage, in an amount according to proof at time of trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs on behalf of themselves and the members of the Class, prays for judgment and relief against Defendants as follows:

A. an order preliminarily and/or permanently enjoining Defendants from violating CPPA, D.C. Code §28-3901 *et seq.*, and pursuing the policies, acts and practices complained of herein;

B. an order of this Court ordering Defendants to immediately cease all acts of unfair competition and enjoin Defendants from continuing to conduct business via the unlawful, unfair or fraudulent business acts or practices as particularized herein;

C. Plaintiffs also requests an order requiring Defendants to identify all class members and pay restitution to Plaintiffs and all members of the Class so as to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, fraudulent or unfair business act or practice, in violation of applicable laws, statutes or regulations or constituting unfair competition or untrue or misleading advertising;

- 44 -

D.      Plaintiffs also requests an order of the Court requiring Defendants to disgorge to the District of Columbia all monies wrongfully collected that could not be returned to class members as alleged herein and all monies and profits derived by Defendants as a result of the wrongful, deceptive, unfair and/or unlawful acts, conduct and practices alleged above, and requiring disgorgement and/or imposing a trust upon Defendants' ill-gotten monies and freezing Defendants' assets;

E.      an order certifying that the action be maintained as a class action;

F.      an order requiring Defendants to effect and pay the costs of restoring the rights and benefits owing to Plaintiffs and other members of the Class under the agreements which are the subject of this action and a corrective advertising campaign;

G.      restitution as may be provided for by equity and/or by statute;

H.      actual and compensatory damages in an amount to be proven at trial, including any damages as may be provided for by statute;

I.      enter and award of damages to Plaintiffs and class members in an amount equal to treble damages or $1,500 per violation whichever is greater pursuant to D.C. Code §28-3905, plus punitive damages;

J.      reasonable attorneys' fees and costs of suit pursuant to D.C. Code §28-3905;

K.      pre-and post-judgment interest; and

L.      such other and further relief as this Court may deem necessary, proper and/or appropriate.

# JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: February 23, 2009

THE LAW OFFICE OF ROGER M. ADELMAN
ROGER M. ADELMAN (DC BAR #56358)

_____
ROGER M. ADELMAN

1100 Connecticut Ave., NW, Suite 730
Washington, D.C.  20036
Telephone:  202/822-0600
202/822-6722 (fax)
radelman@erols.com

JOHN E. DRURY LAW OFFICES
JOHN E. DRURY (DC BAR #924407)
1900 "L" Street, NW, Suite 303
Washington, D.C. 20036
Telephone:  202/463-6131
202/463-6695 (fax)

COUGHLIN STOIA GELLER
        RUDMAN & ROBBINS LLP
FRANK J. JANECEK, JR.
CHRISTOPHER COLLINS
CHRISTIE SURIEL
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

LANDSKRONER • GRIECO • MADDEN, LTD.
JACK LANDSKRONER
1360 West 9th Street, Suite 200
Cleveland, OH  44113
Telephone:  216/522-9000
216/522-9007 (fax)

LAW OFFICES OF ARTIE BARAN, APC
ARTIE BARAN
4545 Murphy Canyon Road, Suite 300
San Diego, CA  92123
Telephone:  858/560-5600
858/836-0318 (fax)

Attorneys for Plaintiffs

## CA Form 1

## Superior Court of the District of Columbia
### CIVIL DIVISION
500 Indiana Avenue, N.W., Room JM-170
Washington, D.C.  20001   Telephone:  879-1133

| |
|---|
| Jammie McKay & Claire Teasley, On Behalf of Themselves & All Others Similarly Situated in D.C. |

*Plaintiff*

vs.

| |
|---|
| Vertrue Incorporated, pka MemberWorks, Incorporated, Adaptive Marketing LLC, and DOES 1 through 50 |

*Defendant*

Civil Action No. 0001108-09

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government  you have 60 days after  service of this summons to serve your Answer. A copy of the Answer must be mailed  to the attorney for the party plaintiff who is suing you. The attorney's name and address appear **below.**   If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Room JM 170 at 500 Indiana Avenue.  N.W. between 9:00 am. and 4:00 pm., Mondays through Fridays or between 9:00 am. and 12:00 Noon on Saturdays.  You may file the original Answer  with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff If you fail to file an Answer, judgment  by default may be entered against you for the relief demanded in the complaint.

*Clerk of the Court*

| |
|---|
| Roger M. Adelman (DC Bar #56358) |

Name of Plaintiff's Attorney

| |
|---|
| 1100 Connecticut Ave. NW, Ste 730 |

Address
| |
|---|
| Washington, D.C. 20036 |

| |
|---|
| 202/822-0600 |

Telephone

By _____
Deputy Clerk

Date  2/23/05

PUEDE OBTENERSE COPIAS DE ESTE FORMULARIO EN ESPANOL EN EL TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA, 500 INDIANA AVENUE, N.W., SALA JM 170

YOU MAY OBTAIN A COPY OF THIS  FORM IN SPANISH AT THE SUPERIOR COURT OF D.C., 500 INDIANA AVENUE, N.W., ROOM JM 170

Form CV(6)-456/Mar. 94

**NOTE:**  SEE IMPORTANT INFORMATION ON BACK OF THIS FORM.

IMPORTANT: IF YOU FAIL TO SERVE AND FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, DO NOT *FAIL TO ANSWER WITHIN THE REQUIRED TIME*

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (628-1 161) or the Neighborhood Legal Services (682-2700) for help or come to Room JM 170 at 500 Indiana Avenue, N.W., for more information concerning where you may ask for such help.

## CA Form 1

# Superior Court of the District of Columbia
## CIVIL DIVISION
### 500 Indiana Avenue, N.W., Room JM-170
### Washington, D.C. 20001  Telephone: 879-1133

| |
|---|
| Jammie McKay & Claire Teasley, On Behalf of Themselves & All Others Similarly Situated in D.C. |

*Plaintiff*

vs.

Civil Action No. 0001108-09

| |
|---|
| Vertrue Incorporated, pka MemberWorks, Incorporated, Adaptive Marketing LLC, and DOES 1 through 50 |

*Defendant*

### SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon your exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government you have 60 days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear **below.** If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Room JM 170 at 500 Indiana Avenue. N.W. between 9:00 am. and 4:00 pm., Mondays through Fridays or between 9:00 am. and 12:00 Noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

*Clerk of the Court*

| |
|---|
| Roger M. Adelman (DC Bar #56358) |

Name of Plaintiff's Attorney

| |
|---|
| 1100 Connecticut Ave. NW, Ste 730 |

Address

| |
|---|
| Washington, D.C. 20036 |

| |
|---|
| 202/822-0600 |

Telephone

By _____
Deputy Clerk

Date  9/23/05

PUEDE OBTENERSE COPIAS DE ESTE FORMULARIO EN ESPANOL EN EL TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA, 500 INDIANA AVENUE, N.W., SALA JM 170

YOU MAY OBTAIN A COPY OF THIS FORM IN SPANISH AT THE SUPERIOR COURT OF D.C., 500 INDIANA AVENUE, N.W., ROOM JM 170

Form CV(6)-456/Mar. 98

**NOTE:** SEE IMPORTANT INFORMATION ON BACK OF THIS FORM.

IMPORTANT: IF YOU FAIL TO SERVE AND FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, DO NOT *FAIL TO ANSWER WITHIN THE REQUIRED TIME*

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (628-1 161) or the Neighborhood Legal Services (682-2700) for help or come to Room JM 170 at 500 Indiana Avenue, N.W., for more information concerning where you may ask for such help.

ORIGINAL

# Superior Court of the District of Columbia

## CIVIL DIVISION - CIVIL ACTIONS BRANCH

### INFORMATION SHEET

JAMMIE McKAY and CLAIRE TEASLEY,
On Behalf of Themselves and All
Others Similarly Situated in the
District of Columbia,

vs

VERTRUE INCORPORATED, previously known as
MEMBERWORKS, INCORPORATED, ADAPTIVE
MARKETING LLC, and DOES 1 through 50

Case Number: 0001108-09

Date: February 23, 2009

| Name: (please print) Roger M. Adelman | Relationship to Lawsuit ☑ Attorney for Plaintiff |
|---|---|
| Firm Name: The Law Office of Roger M. Adelman | ☐ Self (Pro Se) Other: _____ |
| Telephone No.: 202.822.0600    Six digit Unified Bar No.: 56358 | |

TYPE OF CASE:   ☐ Non-Jury        ☐ 6 Person Jury      ☑ 12 Person Jury
Demand:$ _____                    Other: Over $25 Million

PENDING CASE(S) RELATED TO THE ACTION BEING FILED
Case No.: _____ Judge: _____ Calendar #: _____

Case No.: _____ Judge: _____ Calendar #: _____

---

NATURE OF SUIT:    (Check One Box Only)

**A. CONTRACTS**

| | | COLLECTION CASES |
|---|---|---|
| ☐ 01 Breach of Contract | ☐ 07 Personal Property | ☐ 14 Under $25,000 Pltf. Grants Consent |
| ☐ 02 Breach of Warranty | ☐ 09 Real Property-Real Estate | ☐ 16 Under $25,000 Consent Denied |
| ☐ 06 Negotiable Instrument | ☐ 12 Specific Performance | ☐ 17 OVER $25,000 |
| ☐ 15 _____ | | |

**B. PROPERTY TORTS**

| | | |
|---|---|---|
| ☐ 01 Automobile | ☐ 03 Destruction of Private Property | ☐ 05 Trespass |
| ☐ 02 Conversion | ☐ 04 Property Damage | ☐ 06 Traffic Adjudication |
| ☐ 07 Shoplifting, D.C. Code § 27-102(a) | | |

**C. PERSONAL TORTS**

| | | |
|---|---|---|
| ☐ 01 Abuse of Process | ☐ 09 Harassment | ☐ 17 Personal Injury – (Not Automobile, Not Malpractice) |
| ☐ 02 Alienation of Affection | ☐ 10 Invasion of Privacy | ☐ 18 Wrongful Death (Not malpractice) |
| ☐ 03 Assault and Battery | ☐ 11 Libel and Slander | ☐ 19 Wrongful Eviction |
| ☐ 04 Automobile-Personal Injury | ☐ 12 Malicious Interference | ☐ 20 Friendly Suit |
| ☑ 05 Deceit (Misrepresentation) | ☐ 13 Malicious Prosecution | ☐ 21 Asbestos |
| ☐ 06 False Accusation | ☐ 14 Malpractice Legal | ☐ 22 Toxic/Mass Torts |
| ☐ 07 False Arrest | ☐ 15 Malpractice Medical (including wrongful death) | ☐ 23 Tobacco |
| ☑ 08 Fraud | ☐ 16 Negligence-(Not Automobile, Not Malpractice) | ☐ 24 Lead Paint |

---

SEE REVERSE SIDE AND CHECK HERE ☐ IF USED

CV-496/May 08

## INFORMATION SHEET, Continued

| . OTHERS | | |
|---|---|---|
| ☐ 01 Accounting<br>☐ 02 Att. Before Judgment<br>☐ 04 Condemnation (Emin. Domain)<br>☐ 05 Ejectment<br>☐ 07 Insurance/Subrogation<br>    Under $25,000 Pltf.<br>    Grants Consent<br>☐ 08 Quite Title<br>☐ 09 Special Writ/Warrants<br>    DC Code § 11-941 | ☐ 10 T.R.O./Injunction<br>☐ 11 Writ of Replevin<br>☐ 12 Enforce Mechanics Lien<br>☐ 16 Declaratory Judgment<br>☐ 17 Merit Personnel Act (OEA)<br>    (D.C. Code Title 1, Chapter 6)<br>☐ 18 Product Liability<br>☐ 24 Application to Confirm, Modify,<br>    Vacate Arbitration Award<br>    (D.C. Code § 16-4315) | ☐ 25 Liens: Tax/Water Consent Granted<br>☐ 26 Insurance/Subrogation<br>    Under $25,000 Consent Denied<br>☐ 27 Insurance/Subrogation<br>    Over $25,000<br>☐ 28 Motion to Confirm Arbitration<br>    Award (Collection Cases Only)<br>☐ 26 Merit Personnel Act (OHR)<br>☐ 30 Liens: Tax/Water Consent Denied |
| ☐ 03 Change of Name<br>☐ 06 Foreign Judgment<br>☐ 13 Correction of Birth Certificate<br>☐ 14 Correction of Marriage<br>    Certificate | ☐ 15 Libel of Information<br>☐ 19 Enter Administrative Order as<br>    Judgment [D.C. Code §<br>    2-1802.03(h) or 32-1519(a)]<br>☐ 20 Master Meter (D.C. Code §<br>    42-3301, et seq.) | ☐ 21 Petition for Subpoena<br>    [Rule 28-I (b)]<br>☐ 22 Release Mechanics Lien<br>☐ 23 Rule 27 (a)(1)<br>    (Perpetuate Testimony) |

_____        **February 23, 2009**
Attorney's Signature                          Date

96/May 08



**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

JAMMIE MCKAY
Vs.                                        C.A. No.      2009 CA 001108 B
VERTRUE INCORPORATED

## INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("SCR Civ") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the Summons, the Complaint, and this Initial Order. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in SCR Civ 4(m).

(3) Within 20 days of service as described above, except as otherwise noted in SCR Civ 12, each defendant must respond to the Complaint by filing an Answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in SCR Civ 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an Initial Scheduling and Settlement Conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than six business days before the scheduling conference date. No other continuance of the conference will be granted except upon motion for good cause shown.

Chief Judge  Lee F. Satterfield

Case Assigned to: Judge JUDITH N MACALUSO
Date:  February 23, 2009
Initial Conference: 9:30 am, Friday, May 29, 2009
Location:  Courtroom A-50
          515 5th Street N.W.
          WASHINGTON, DC 20001

Caio.doc

## ADDEN. .M TO INITIAL ORDER AFFECTI. .
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www:dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 105, 515 5th Street, N.W. (enter at Police Memorial Plaza entrance). Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code § 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Clerk's Office. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief Judge Lee F. Satterfield

Caio.doc